IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| CARL JUNCTION R-1 SCHOOL DISTRICT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | Case No.: 05-3L |
| | ) | Judge Robert H. Hodges, Jr. |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant, | ) | |

**SUGGESTIONS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Comes Now the Plaintiff, the Carl Junction R-1 School District, by and through its counsel, pursuant to Ct. Claims Rule 56(h)(1), and herewith submits its Suggestions in Support of Partial Summary Judgment as follows:

**SUMMARY JUDGMENT STANDARD OF REVIEW**

Claims Court Rule 56, governing summary judgment provides, in relevant part,

> (c) Motion and Proceedings Thereon. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

RCFC 56(c). Summary judgment is the salutary method of disposition designed to secure just, speedy and inexpensive determination of every action, including actions for just compensation under *Fifth Amendment. Norman v United States*, 38 Fed. Cl. 417 (1997).

The party moving for summary judgment has the burden of showing absence of genuine issue as to any material fact and may discharge its burden by showing absence of evidence to support nonmoving party's case, so that failure of proof concerning essential element of nonmoving party's case entitles moving party to legal judgment. *Embrey v United States,* 17 Cl. Ct. 617 (1989). Due to ad hoc nature of constitutional taking claims, such disputes often revolve around factual issues that can be determined only after trial or upon examination of fairly complete record. *Pleasant Country v United States,* 37 Fed. Cl. 321 (1997). However, only by analyzing the legal result sought to be compelled on motion for summary judgment can the court determine what facts must be established and whether those facts are in genuine dispute. *Leyman Mfg. Corp. v United States*, 8 Cl. Ct. 535 (1985).

The applicable standard of review governing summary judgment was recently discussed in *City of Gettysburg v. U.S.*, 64 Fed. Cl. 429, 436-7; (2005), aff'd, *City of Gettysburg v. United States, 2006 U.S. App. LEXIS 7228 (Fed. Cir., Mar. 16, 2006)* as the following:

> The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judg ment as a matter of law." *RCFC 56(c)*. Defendant, as the moving party, has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex, 477 U.S. at 322*. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson, 477 U.S. at 255*. Summary judgment pursuant to *RCFC 56*

> properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc., 739 F.2d 624, 626 (Fed. Cir. 1984).*

In general, interpreting terms of a contract is matter of law that is appropriate to resolve on motion for summary judgment. *Barseback Kraft AB v. United States*, 36 Fed. Cl. 691 (1996), 41 CCF P 77040, aff'd. 121 F3d. 1475, (1997, CA FC), 42 CCF P 77187.

## ARGUMENTS AND AUTHORITIES

**I. THE PLAINTIFF, CARL JUNCTION SCHOOL DISTRICT, IS ENTITLED TO PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF ITS STANDING, ITS OWNERSHIP OF THE REAL PROPERTY CONDEMNED BY THE FEDERAL GOVERNMENT AS A CONSEQUENCE OF RAILBANKING PURSUANT TO SECTION 8(d) OF THE NATIONAL TRAILS SYSTEM ACT, 16 U.S.C. § 1247(d), AND PROCEEDINGS BEFORE THE SURFACE TRANSPORTATION BOARD, DOCKET AB-6 (SUB-NO. 395X), AND OTHERWISE FOR ITS ENTITLEMENT TO COMPENSATION FOR THE CONDEMNATION.**

The Government has taken the position in this portion of the condemnation litigation pending before this Court that the Plaintiff, Carl Junction R-1 School District, is prohibited by law from recovering any condemnation award because, essentially, the District does not own any of the railroad right-of-way which bisects the school's campus. The Government, in order to support this position, must necessarily rely upon a transaction in June 1876 that occurred between a landowner and two individual speculators. As will be seen below, the Government's reliance upon the transaction is erroneous and otherwise misplaced.

As a preliminary matter, the Court is directed to the Proposed Statements of Uncontroverted Fact submitted by the Plaintiff which are attached hereto and incorporated herein by this referenced. The Plaintiffs respectfully point out that the facts

and the law of the case are best placed into their respective proper context by juxtaposing the June 1876 transaction onto the chronology of facts that reliably are found, for the most part, in a carefully preserved public record that clearly belies any sustainable defense by the Government, thereby entitling Plaintiff to a partial summary judgment on the issue of liability. It is noteworthy, also as a preliminary matter, to observe that the Government has asserted as its sole affirmative defense that the Plaintiff fails to state a claim upon which relief can be granted. See Answer, p. 4 – "Affirmative Defense".

Plaintiff's Statement of Uncontroverted Facts reveals that the District obtained certain parcels of real estate with historical real property transfers by and between individuals predating the District's acquisition of the real estate parcels beginning in the mid-1800's. The transaction which Plaintiff believes the Government principally bases its defense of non-liability to the District is a June 14, 1876 transaction by Charles L. Skinner to Joseph Seligman and Josiah Macy, Jr. (Statement of Fact # 30; Ex. 17, 18). The language of the June 14, 1876 deed provides the following,

> "A strip of land one hundred (100) feet wide, being fifty feet equi-distant from the center of the railroad track of the railroad owned and operated by parties of the second part known as M.C. & N.W.R.R. where the same is located and constructed over and through the following described large tracts of land to wit: The S.W. (¼) Quarter of Section (5) Five, the South (½) of Section (6) Six and the North (½) half of Section (7) Seven, all in Township (28) Twenty-Eight and Range (33) Thirty-Three.

The District submits that the deed must be analyzed substantively as it relates to the condemnation claim as well as for the events and facts that surround the historicity and, consequently, the accuracy of the document. These matters will be addressed below with attention to scrutiny of the transaction itself and the parties to the transaction. In the end, the Plaintiff maintains that the clear and unambiguous conclusion which must be made is

that this transaction does not affect the District's entitlement to compensation arising out of railbanking of the right-of-way pursuant to the National Trails Act.

**A. The Plaintiff District Possesses Standing to Assert the Condemnation Claims Against the Government Arising Out of Federal Railbanking Law, Having Submitted a Prima Facie Case of Entitlement To A Condemnation Award Pursuant to the Applicable Summary Judgment Legal Standards and Otherwise Has Established Its Entitlement to Summary Judgment Relief.**

The District has met the legal preconditions to assert a condemnation claim in the present case and, substantively, has likewise established a prima facie case of liability of the Government for a takings claim pursuant to the *Fifth Amendment*. See *Glosemeyer v. U.S.*, 45 Fed. Cl. 771, 781 (2000) (". . . but for the application of the Rails-to-Trails Act, the plaintiffs would have been seised in their lands without any restrictions, we have little difficulty concluding that a taking has occurred."). A jurisdictional requirement to bring a takings claim in this court is that the government's action be authorized. *See Tabb Lakes, Ltd. v. United States,* 10 F.3d 796, 802 (Fed. Cir. 1993); *Sun Oil Co. v. United States*, 572 F.2d 786, 819, 215 Ct. Cl. 716 (Ct. Cl. 1978). In addition to demonstrating that the government activity was authorized, plaintiff must also show that it has a cognizable property interest. *See, e.g., Wyatt v. United States*, 271 F.3d 1090, 1097 (Fed. Cir. 2001) (cognizable property interest is a requirement for asserting an action for a compensable taking under the *Fifth Amendment*), cert. denied, 535 U.S. 1077, 152 L. Ed. 2d 1021, 122 S. Ct. 1960 (2002).

There is expected to be little, if any, resistance to Plaintiff's observation that the Government's role in the conversion of the former BNSF railbed to a recreational walking trail pursuant to the Federal Rails-to-Trails statutory and regulatory framework by issuance of a NITU constitutes the Government's authorization of the actions taken to

preserve the railbed for public use and, consequently, meets the first prong of the standing test, supra. The second prong of the test, Plaintiff's evidence of a cognizable property interest, presents the issue, the answer to which will necessarily dictate the viability of the District's claim for an award as a result of the condemnation from the federal railbanking law. Plaintiff submits the facts stated hereinabove, together as applied by the law of the case, clearly establish summary judgment as a matter of law in favor of the District.

It does not appear that the Government will raise material objections to the fact of District's ownership of real property along and adjacent to the railbed running through the school's campus. See Facts # 2 – 5 (Ex. 1 – 3). Furthermore, it appears to be beyond dispute that the District owned real estate along and adjacent to the railbed at the time of the issuance of the NITU in 2002. Statement of Fact # 11. As stated, the events surrounding the June 14, 1876 transaction is expected to become the fulcrum underlying this Court's decision.

Two series of events will arguably tip the scales of justice to the District in the present case. First, although the citizenry of early 1870's Jasper County, Missouri eagerly anticipated the advent of the railroad era, the failure of the short-lived Memphis, Carthage and Northwestern Railroad will be shown to have reverberations to the present. Second, real estate transactions in the 1870's will undoubtedly determine the fate of successors in interest over 130 years later.

The October 26, 1871 editorial of the local newspaper, *The Carthage Banner*, spoke for the citizens' attitude concerning the construction of the roadbed at issue by the Carthage, Memphis and Northwestern Railroad Company, where the paper opined,

" . . . the prospects for a railroad are assured. The days of the stage rides to and from Carthage are nearly numbered. Hurrah for the first railroad to Carthage."

The citizenry, full of anticipation, but lacking in foresight, would soon observe that, the Memphis, Carthage and Northwestern Railroad Company, created in July 1871 by fellow local citizens would, in a little over three years, become insolvent in December 1874, leaving in its wake unpaid financiers, unpaid contractors, suppliers and bond subscribers and numerous law cases would result that ultimately would wind up in the United States Supreme Court and Missouri Supreme Courts. The relevance of these observations would soon be painfully obvious.

Commencing in 1871 and thereafter, the Memphis, Carthage and Northwestern Railroad initiated condemnation proceedings to secure the 100 foot right-of-way now in issue. Although the Railroad was short-lived, it deposited the monies meant to pay the landowners into the Jasper County Circuit Court's registry prior to its demise. Even after the insolvency and dissolution of the Memphis, Carthage and Northwestern Railroad in 1874, court proceedings continued purportedly in the name of the defunct railroad. Specifically, condemnation proceedings continued unabated and law cases progressed against the defunct Railroad and its stockholders, including Joseph Seligman and Josiah Macy, Jr., as they wound through Missouri and Federal courts, notwithstanding the failure of a corporate structure and the insolvency of the railroad. It is in this chaotic time period after the insolvency and dissolution of the Memphis, Carthage and Northwestern Railroad Company in 1874, that the events now confronting this Court come to the forefront. There was no other railroad available at the time of the insolvency and dissolution of the Memphis, Carthage and Northwestern Railroad in 1874 to take over the reigns of railroad operation. The St. Louis and San Francisco Railway Company would

not become a Missouri corporation until September 1876. The railroad construction started by the Memphis, Carthage and Northwestern Railroad was still not completed in early 1876 – condemnation proceedings were still being heard and decided in March 1876.

Notwithstanding the lack of presence of the railroad, activity continued on the roadbed. Joseph Seligman and Josiah Macy, Jr. *thought* perhaps that they had purchased 100 feet of the railroad right of way from Charles L. Skinner in the June 14, 1876 transaction detailed supra. Plaintiff submits that Charles Skinner did not legally own the entire South half of Section 6 or North half of Section 7, Township 28 North, Range 33 West in Jasper County, Missouri to convey to Joseph Seligman and Josiah Macy, Jr. in the first instance.

There are several corroborating evidentiary matters that compel this conclusion.

The first indication of Charles Skinner's legal inability to convey, "a strip of land (100) feet wide . . . over and through . . . the South (½) of Section (6) " to Seligman and Macy (Ex. 17 – General Warranty Deed) is viewing the 1876 ownership map. (Ex. 16). The exhibit shows that D.C. Skinner owned, at the time of the preparation of the map, 44.46 acres on the west end of the South half of Section 6 and 80 acres on the east end. (Ex. 16). The middle 160 acres of the South half of Section 6, Township 28 North, Range 33 West is shown as owned by H.C. Young. The same real estate holdings are shown on Exhibit 16 regarding ownership of the North half of Section 7, Township 28 North, Range 33 West, Jasper County, Missouri. Once again, in almost a bookend style, D.C. Skinner is shown as owning the east and west ends of the North half of Section 7,

while D.C. Young is shown as owner of a 160 acre parcel in the middle – 320 acres in total.

The abstracts to the District's real property, together with the deeds in the public record, likewise corroborate the map's indication of ownership of the South half of Section 6 resting in both D. C. Skinner and H.C. Young. The Jasper County, Missouri Recorder of Deeds records indicate that D.C. Skinner obtained an interest to only a part of the South half of Section 6, by Order of the Jasper County, Missouri Court on June 15, 1866 (Ex. 25 – Abstract entry #49 – Jasper County Court Book "E", page 68), by which Skinner received his interest by quit claim deed issued by the Court on June 15, 1866 and filed December 24, 1867. (Ex. 25 – Deed). The Court's Order and the quit claim deed issued to D.C. Skinner by the Court each refer to the conveyance as confined to,

> " Lot 2 Southwest Quarter of Section 6, Township 28, Range 33 and the West half Northwest Quarter of Section 7, Township 28, Range 33."

There is no reference to any other ownership rights of D.C. Skinner in Section 6 elsewhere in the abstract or public records. Seven years later, D.C. Skinner, father of Charles L. Skinner (Deed Record 75, page 259 – November 22, 1884), D.C. Skinner transfers real property to Charles L. Skinner by warranty deed dated October 17, 1874 for property described as: "South Half Lot 2 Southwest Quarter of Section 6, Township 28, Range 33, and West Half Northwest Quarter of Section 7, Township 28, Range 33". (Exhibit 26 – Deed). No mention is made in this transfer of any rights of the elder Skinner to the entirety of the South half of Section 6 nor was any reference made as to any basis for a claim to the entirety of the North half of Section 7.

Amidst this historical background, less than two years later, on June 14, 1876 , Charles Skinner attempted to sell a hundred feet strip of land to Seligman and Macy,

"over and through Section 6, Township 28, Range 33, and the North half of Section 7, Township 28, Range 33." (Exhibit 17). Clearly, Charles L. Skinner could only transfer to Seligman and Macy what he owned – that coming from his father in 1874. Neither D.C. Skinner nor Charles L. Skinner owned the rights to convey the 100 foot strip of land through the entirety of the South half of Section 6 or the North half of Section 7, because someone else owned the property – H.C. Young and his assigns and transferees.

Plaintiff's position that Charles L. Skinner could not sell or otherwise alienate the whole of the South half of Section 6 and the whole of the North half of Section 7 to Seligman and Macy is further supported when reviewing the records regarding ownership acquired by H.C. Young. H.C. Young first acquired interest in Section 6 and 7, respectively, by Sheriff's Deed dated October 9, 1866, (Ex. 20), in property described as, "the East (½) of the Southwest (¼) and the West (½) of the Southeast (¼) of Section 6, Township 28, Range 33 and the East (½) of the Northwest (¼) and the West (½) of the Northeast (¼) of Section 7, Township 28, Range 33." A cursory review of this transaction alone would appear to give clear indication that Charles Skinner did not possess the ownership or right to convey the property over the South half of Section 6 and the North half of Section 7 to Seligman and Macy.

The subsequent chronology of events likewise points to the accuracy of the Plaintiff's position that Charles Skinner conveyed property to Seligman and Macy that he did not own. On February 19, 1870, H.C. Young received a quit claim deed to the property. (Ex. 21). In March 1876, H.C. Young, already a Defendant in a condemnation action filed by the Memphis, Carthage and Northwestern Railroad, is ordered by the Jasper County, Missouri Court to give the insolvent railroad a 100 foot right-of-way over

his property described by the Court as the, "South half of Section (6) Six in Township 28, Range 33". (Exhibit 13, p. 3). H.C. Young and his wife conveyed the property to Augustus Knight on June 13, 1876 and the same was recorded on June 27, 1876 (Ex. 22). The conclusion that must be drawn from these collective events is that Charles L. Skinner could not legally give the fee ownership to Seligman and Macy of any right of way over real property owned by H.C. Young, his successors and assigns.

The District, in light of the above, submits that it possesses a cognizable property interest, both in terms of standing and for its substantive claim for an award by virtue of its condemnation Complaint against the Government. In fact, in consideration of the statement of uncontroverted material fact presented by Plaintiff and, further, Plaintiff's submission of a prima facie case for condemnation against the Government arising directly out of the issuance of a NITU, Plaintiff asserts that it has met the standard of review for the Court's issuance of a partial summary judgment against the Government on the issue of its liability.

**B. Joseph Seligman and Josiah Macy, Jr., acting as personal representatives of Seligman & Company, the principal secured creditor of the Memphis, Carthage and Northwestern Railroad Company, were not operating the railroad subsequent to its dissolution in 1874 as stockholders or otherwise.**

The Government apparently takes the further position that Joseph Seligman and Josiah Macy, Jr., in participating in the alleged purchase of the 100 foot right-of-way across Section 6 and 7, Township 28, Range 33 in Jasper County, Missouri, were acting as the Memphis, Carthage and Northwestern Railroad in the purported purchase, notwithstanding the fact that the alleged sale from Charles Skinner was specifically to Seligman and Macy as individuals. Their position would necessarily be compelled to conclude that the Memphis, Carthage and Northwestern Railroad Company was the

intended beneficiary or the actual nominee of the transaction, not Seligman or Macy individually or as a partnership. This position is undermined by the facts and the law of the case that was resolved contemporaneously in Seligman and Macy's era.

It is noteworthy to observe again that, at the time of the Skinner to Seligman and Macy transaction in June 1876, the Memphis, Carthage and Northwestern Railroad Company had dissolved under Missouri law over a year previously in late 1874 and was insolvent before that period. Furthermore, no other railroad or private financier had come forward to the aid of the beleaguered Memphis, Carthage and Northwestern Railroad prior to the transaction in 1876. Creditors sued the railroad, as well as Seligman and Macy, in both federal and Missouri state courts. There were no less than eighteen reported Federal and state cases concerning either the railroad, Joseph Seligman or Josiah Macy, Jr., including seven cases which ended up in the United States Supreme Court.

Perhaps one of the most noteworthy cases is *Burgess v. Seligman,* 107 U.S. 20; 2 S. Ct. 10; 27 L. Ed. 359 (1883), concerning the attempt by the unpaid general contractor of the roadbed to collect a substantial Kansas judgment against the Joseph Seligman and/or Josiah Macy, Jr. Previous to the *Burgess* case, at least two Missouri Supreme Court cases held Joseph Seligman personally liable as a stockholder for debts of the Memphis, Carthage and Northwestern Railroad; *Griswold v. Seligman*, 72 Mo. 110, 119-120 (1880) ("To deny in such circumstances defendants' liability would be to declare the unpalatable doctrine, a doctrine peculiarly unpalatable in American courts, that a person may play fast and loose; may enjoy all the benefits and emoluments of stockholdership without shouldering a tithe of its usually inseparable burdens; may accomplish by an indirection what could not be accomplished directly; may, in a word, be a stockholder to

*vote* but not a stockholder to *pay*. The bare statement of such a doctrine condemns it, and its perniciously unjust results justify the condemnation.”); *Fisher v. Seligman*, 75 Mo. 13, 20-21 (1881) ("A method of issuing bonds and selling no stock, but issuing paid up stock, on which nothing has ever been paid, to the bond-holder, who is to vote the stock, and, when called by a creditor, to say that though nothing has ever been paid on the stock, and no one is liable upon it; that his voting was illegal though it gave him control of the road; and that he merely held the stock as collateral though it represented no indebtedness of anybody, no property, and nothing but a right to vote -- would seem to be an ingenious evasion of the law.").

The U.S. Supreme Court in *Burgess*, however, distinguished the two Missouri cases and relying on a Missouri statute at the time, held that Joseph Seligman was not liable as a stockholder.

> Upon a careful examination of the facts found in this case we do not see how a reasonable doubt can exist, that the Seligmans held the stock in question as trustees and custodians by way of collateral security for themselves and the purchasers of the bonds. That was clearly the intent of the parties, declared in almost so many words; and that intent must prevail unless, by some inadvertency in carrying it out, the Seligmans have been unwittingly caught in some legal snare of which the creditors can take advantage.

*Burgess v. Seligman*, 107 U.S. 20, 28; 2 S. Ct. 10, 16; 27 L. Ed. 359 (1883). There is no evidence in the record or otherwise contained in the numerous cases that were decided in Federal or State Court in the late 1800’s concerning the railroad that support any claim that Joseph Seligman or Josiah Macy, Jr. were operating the Memphis, Carthage and Northwestern Railroad Company after its insolvency and dissolution personally or as a partnership. Consequently, any claim that Seligman and Macy were acting as the railroad are unsupported and fail as a matter of law.

WHEREFORE, the Plaintiff District requests that the Court grant its Motion for Partial Summary Judgment for the reasons set forth herein, as also contained in the Proposed Statements of Uncontroverted Fact, the Exhibits and otherwise for such other and further reasons as the Court deems just and equitable.

Respectfully Submitted,

s/ R. Deryl Edwards, Jr.
LAW OFFICES OF R. DERYL EDWARDS, JR
R. Deryl Edwards MO# 48277
606 S. Pearl
Joplin, MO 64801-2582
(417) 624-1962
(417) 624-3151
rde417@hotmail.com

and

RICHART LAW OFFICES
Robert W. Richart Mo Bar #18917
L. Dean Wilson #39356
610 Pearl, Suite C
Joplin, Missouri 64801
Phone: 417-781-6770
Fax: 417-781-7554
richartlaw@hotmail.com
ATTORNEYS FOR PLAINTIFF